UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID PEARSON,

           Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY,

           Defendant.

CASE NO. C15-0245JLR

ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE RECORD

## I. INTRODUCTION

This matter comes before the court on the parties' cross-motions for judgment on the record.[1]  (Plf. Brief (Dkt. # 9); Dft. Brief (Dkt. # 10).)  Plaintiff David Pearson seeks a court order compelling Defendant Aetna Life Insurance Company to pay him long-term disability ("LTD") benefits, and Aetna seeks a court order concluding that Mr. Pearson is

---

[1] The court construes the parties' "trial briefs" as cross-motions for judgment on the record.

ORDER- 1

not entitled to LTD benefits. (Plf. Brief; Dft. Brief; *see also* Compl. (Dkt. # 1) at 1, 7-8.) Pursuant to their agreement, the parties submitted their dispute to the court by filing simultaneous briefs, simultaneous responses, and the administrative record. (JSR (Dkt. # 8) at 5; *see also* Plf. Brief; Dft. Brief; Administrative Record ("A.R.") (Dkt. ## 11 through 11-9); Plf. Resp. (Dkt. # 12); Dft. Resp. (Dkt. # 13).) Having considered the submissions of the parties, the appropriate portions of the record, and the relevant law, the court GRANTS Aetna's motion and DENIES Mr. Pearson's motion.

## II.   BACKGROUND

### A.   Mr. Pearson's Job at Group Health

This dispute concerns Aetna's denial of LTD benefits to Mr. Pearson. (*See generally* Compl.) Mr. Pearson worked as a manager in planning and evaluation at Group Health Cooperative.[2] (A.R. at 1047.)[3] The job description for Mr. Pearson's position[4] indicates that he "[f]requently (34 – 65%)" was required to sit and grasp/handle and that he "[o]ccasionally (1 – 33%)" was required to stand or walk. (*Id.* at 1049.) Mr. Pearson had to perform all other potential "[p]hysical [d]emands," such as carrying items, lifting, or pushing/pulling, "[r]arely ([l]ess than 1%)." (*Id.*) Mr. Pearson's position also required "[c]ontinuous[] (66 – 100%)" cognitive and psychological engagement,

---

[2] Mr. Pearson initially named Group Health as a defendant, but the parties stipulated to dismissal of any claims against Group Health on April 15, 2015. (Stip. (Dkt. # 7).)

[3] The court cites to the internal pagination of the administrative record, which begins with AET000001. For brevity, the court omits the "AET" and any preceding zeros when citing to the administrative record.

[4] Neither party suggests that the actual demands of Mr. Pearson's position varied meaningfully from Group Health's job description. (*See* A.R. at 1047-51.)

ORDER- 2

including the ability to "[r]ead/[u]nderstand/[a]nalyze/[r]ecall" and operate under "[d]eadlines/[f]ast-[p]aced [e]nvironment." (*Id.* at 1050.)

### B.  Mr. Pearson's LTD Policy Through Aetna

In his role at Group Health Cooperative, Mr. Pearson received an LTD insurance plan through Aetna. (*See id.* at 41-66.) The policy is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). (Compl. ¶¶ 5-6.)

Mr. Pearson contends that he suffered a disability within the meaning of the policy and is entitled to benefits. (Compl. ¶ 23; Plf. Brief.) The policy defines disability as follows:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
> - you are not able to perform the **material duties** of your **own occupation** solely because of: disease or **injury**; and
> - your work earnings are 80% or less of your **adjusted predisability earnings.**
>
> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any **reasonable occupation** solely because of:
> - disease; or
> - **injury.**

(A.R. at 50.)[5] The policy also defines several relevant terms, including:

- Material duties—"These are duties that are normally required for the performance of your **own occupation**, and cannot be reasonably: omitted or modified.

---

[5] The policy denotes the terms that are defined in the policy's glossary by placing them in bold font. (*See, e.g.*, A.R. at 50, 62.) The court has retained the bold formatting from the original policy when quoting from it.

ORDER- 3

However, to be at work in excess of 40 hours per week is not a material duty." (*Id.* at 62.)

- Own occupation—"This is the occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed: for your specific employer; or at your location or work site; and without regard to your specific reporting relationship." (*Id.*)
- Reasonable occupation—"This is any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your **adjusted predisability earnings.**" (*Id.* at 63.)

The dispute at the core of this case is whether Mr. Pearson was disabled under the definition in the policy.

C.  Mr. Pearson's Asserted Disability

For longer than a decade, Mr. Pearson had suffered from lower back pain stemming from an injury suffered in 2000 while playing tennis. (*Id.* at 85, 210, 646.) Dr. Arne Andersen has treated Mr. Pearson since the initial injury. (*Id.* at 646.) Mr. Pearson's doctors prescribed him an escalating series of treatments and medications, none of which "provided [Mr. Pearson] with any significant pain control." (*Id.*) Mr. Pearson began taking opioids to reduce the pain in 2001. (*Id.*) In 2002, Mr. Pearson declined surgery because the treating neurosurgeons believed surgery "would be no better than [sic] 50-50 proposition." (*Id.*) As of June 2012, Mr. Pearson was taking eight

ORDER- 4

hydrocodone with acetaminophen each day. (*Id.*; *see also id.* at 383)  Sitting and standing caused him the most pain, but eventually he began feeling pain while lying down as well. (*Id.* at 646.)  Dr. Andersen believes Mr. Pearson's steady increase in pain was due to disc degeneration. (*Id.* at 647.)

Mr. Pearson's lower back pain eventually worsened to the point that he took an indefinite leave of absence from Group Health. (*Id.* at 646.)  He worked his final day for Group Health on February 28, 2010. (*Id.* at 69.)  In May 2010, he applied to receive LTD benefits from Aetna. (*Id.*)

D.   **Aetna's Initial Denial of Benefits**

On August 11, 2010, after performing a "complete review of [Mr. Pearson's] LTD file," Aetna concluded that Mr. Pearson was not "disabled from performing the material duties of [his] own occupation" and denied Mr. Pearson's request for LTD benefits. (*Id.* at 185-86.)  Following Aetna's denial of benefits, Dr. Andersen sent Aetna a letter on Mr. Pearson's behalf. (*Id.* at 187.)  Aetna reviewed Dr. Andersen's letter and the information submitted therewith and declined to reverse its LTD decision because the letter did not include "new medical records." (*Id.*)  On February 2, 2011, Mr. Pearson sent a letter to Aetna requesting an extension of Mr. Pearson's time to appeal Aetna's decision. (*Id.* at 1025-26.)  Aetna apparently did not grant that request. (*See generally id.*; *see also* Plf. Brief at 8 ("Aetna simply ignored the request . . . .").)

Mr. Pearson subsequently sued Aetna and Group Health for wrongfully denied benefits. *See Pearson v. Group Health Cooperative*, No. C12-0009RAJ (W.D. Wash. Jan. 3, 2012), Complaint (ECF No. 1).  In October 2012, the parties stipulated to

ORDER- 5

dismissal of that case without prejudice. *Id.*, 10/22/12 Min. Order (ECF No. 15). As part of the agreement, Aetna allowed Mr. Pearson to supplement the administrative record until January 15, 2013. (A.R. at 987-89.) Mr. Pearson submitted several additional pieces of evidence in November 2012, including further medical records from Dr. Andersen, a statement from Dr. John Gayman, Mr. Pearson's primary care physician, and a favorable determination on Mr. Pearson's disability claim under the Social Security Act ("SSA").[6] (*Id.* at 988, 990-1003, 1054-56.)

E.   **Aetna's Second Denial of Benefits**

Aetna then arranged for Dr. Robert Swotinsky to perform an independent review of Mr. Pearson's medical records. (*Id.* at 346-54.) Dr. Swotinsky reviewed hundreds of pages of medical records and spoke with Dr. Andersen regarding Mr. Pearson's condition. (*Id.* at 350.) Dr. Swotinsky noted that Mr. Pearson's conditions were "normal findings at age 62" and "not synonymous with low back pain." (*Id.* at 351.) He further noted that Mr. Pearson's job is "sedentary" and "primarily seated," and that "there is not a scientific basis for drawing a causal link between his sedentary work and symptoms of low back pain." (*Id.*) Dr. Swotinsky also found important Mr. Pearson's leisure activities, which included "a week of salmon fishing in Vancouver," off-road dirt biking, "[l]ifting weights and using the treadmill and elliptical machines," and traveling between

---

[6] On June 15, 2012, after reviewing medical records and hearing live testimony from Mr. Pearson and a vocational expert, an administrative law judge ("ALJ") concluded that Mr. Pearson is eligible for disability benefits under the SSA. (A.R. at 990, 993-98.) Under the relevant section of the SSA, "[d]isability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (*Id.* at 993.)

ORDER- 6

Washington and California. (*Id.*) In Dr. Swotinsky's view, the objective evidence trumped the opinion of Dr. Andersen, who was "essentially . . . passing along what [Mr. Pearson] states he can tolerate." (*Id.* at 353.) Dr. Swotinsky concluded that neither Mr. Pearson's low back pain nor any other condition precluded him from performing his sedentary job at Group Health. (*Id.*)

On October 13, 2013, Aetna informed Mr. Pearson that it could not approve his claim based on his current medical records and that "an Independent Medical Examination (IME) w[ould] be necessary for further disability evaluation." (*Id.* at 188.) On November 20, 2013, Dr. Michael Allison performed an IME on Mr. Pearson in Renton, Washington.[7] (*Id.* at 278; 283-301.) The IME includes a review of Mr. Pearson's history of lower back pain. (*Id.* at 283-84.) In that review, Dr. Allison focused on Mr. Pearson's medical records beginning in 2010, in part because "[m]ost of his initial workup and treatments ha[d] been lost." (*Id.* at 283, 285-98.) Dr. Allison also reviewed the SSA determination before forming his conclusion. (*Id.* at 301.)

Dr. Allison thoroughly described the examination process in his report. (*Id.* at 298-99.) As part of the exam, Dr. Allison observed and described Mr. Pearson's behavior and demeanor. (*See id.*) Mr. Pearson "was not using any assistive devices or brace," "showed no sign of any limping or instability," "moved smoothly from sitting to standing," "leaned forward and had no difficulty with such," was "intelligent,

---

[7] Although Mr. Pearson repeatedly informed Aetna that he would bring a third-party observer to the IME (A.R. at 149-50), Dr. Allison did not allow the observer to attend the IME because it was not "prearranged" (*id.* at 298). However, there is no evidence that Dr. Allison's IME was incomplete or improper.

ORDER- 7

cooperative, and . . . seemed to have a good memory of most of his treatments." (*Id.*) Dr. Allison also described testing that he performed on Mr. Pearson. (*Id.* at 299.) Mr. Pearson "show[ed] no nerve root signs in a sitting or supine position," had a "full range of motion" in his hips and shoulders and "full extension" in his knees, showed no "atrophy" or "asymmetry" in his lower extremity, and evinced "no nerve root signs in a sitting or supine position." (*Id.*) Furthermore, Mr. Pearson reported a pain level of "approximately 3 to 4 on a scale of zero to 10." (*Id.*) He indicated low back pain in response to "[a]xial compression on the head" but only "a little stiffness and pain" in response to "[e]n bloc rotation with his arms held at his sides and twisting of the torso." (*Id.*) Finally, Dr. Allison performed strength and flexibility tests on Mr. Pearson's lower extremities in a sitting position and found all of them to be a five out of five. (*Id.*)

Based on his review and examination, Dr. Allison concluded that Mr. Pearson's condition warranted minor physical limitations but that his capabilities were "consistent with a fairly active lifestyle." (*Id.* at 301.) Dr. Gayman reviewed Dr. Allison's opinion and disagreed, indicating that "imaging often does not correlate well with the degree of pain" and that Mr. Pearson was not "capable of 8 hours of sedentary work daily" because "he needs to be able to change positions frequently and had to lay down every 30-45 minutes due to the pain." (*Id.* at 275.) Even given those accommodations, Dr. Gayman opined that the pain rendered Mr. Pearson incapable of concentrating on work.[8] (*Id.*)

---

[8] Aetna also provided Dr. Allison's IME report to Dr. Andersen, who apparently did not respond. (*See* A.R. at 268.)

ORDER- 8

On February 24, 2014, Aetna again denied Mr. Pearson's claim for LTD benefits. (*Id.* at 266.) Aetna acknowledged the contrary opinions of Drs. Andersen and Gayman and the apparent conflict between Aetna's determination and the ALJ's SSA disability determination. (*Id.* at 268.) However, Aetna found Dr. Allison's IME and the objective evidence to not support Drs. Andersen and Gayman's opinions. (*Id.*) Furthermore, the SSA implicates a different standard and the ALJ considered different evidence than is applicable to Aetna's policy, and Aetna accordingly afforded the ALJ's determination "little weight." (*Id.*)

F.  **Aetna's Denial of Mr. Pearson's Appeal**

In August 2014, Mr. Pearson appealed Aetna's determination through Aetna's internal appeals process. (*Id.* at 235-48.) In conjunction with the appeal, Aetna arranged an occupational medicine peer review by Dr. Katherine Duvall. (*Id.* at 210-20.) Dr. Duvall reviewed an extensive series of records, including multiple reports by Drs. Andersen and Gayman. (*Id.* at 211.) Dr. Duvall also spoke with Drs. Gayman and Andersen. (*Id.* at 217, 220.) Among other observations, Dr. Duvall noted that Mr. Pearson usually had a pain level of 4 out of 10 and that the pain "affects his work, recreation and sleep at a 9." (*Id.* at 212.) She also flagged the accommodations that Group Health provided Mr. Pearson—"a couch, zero gravity chair, flexible schedule and ability to change positions frequently." (*Id.* at 218.) Dr. Duvall concluded that Mr. Pearson "ha[d] no functional impairment" from March 1, 2010, through September 30, 2014, and was "capable of working" with certain "restrictions and/or limitations." (*Id.* at 217-19.)

On September 26, 2014, Aetna upheld its decision to deny Mr. Pearson LTD benefits. (*Id.* at 204-06.) Aetna indicated that its decision was final, and that Mr. Pearson would have to file a lawsuit under ERISA to challenge the decision. (*Id.* at 206.) This lawsuit followed. (*See* Compl.)

### III.   ANALYSIS

#### A.   Legal Standard

Mr. Pearson brings this suit under ERISA's civil enforcement provision, which allows a claimant to file suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties agree that the court's standard of review here is *de novo*.[9] (Plf. Brief at 11-13; Dft. Brief at 13-14.) In the ERISA context, "[t]he district court may try the case on the record that the administrator had before it." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). Where a court reviews the administrator's decision, as here, "the record that was before the administrator furnishes the primary basis for review." *Id.* at 1090; *cf. Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995) (creating an exception where "additional evidence is necessary to conduct an

---

[9] The LTD policy purports to confer on Aetna the discretionary authority to determine benefits eligibility and construe the policy language. (A.R. at 39.) This discretionary clause would make "abuse of discretion" the applicable standard of review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, Washington law holds this discretionary clause unenforceable in such insurance contracts. WAC 284-96-012. Both parties acknowledge this reasoning and agree that *de novo* review is therefore appropriate here. (Plf. Brief at 11-13; Dft. Brief at 13-14); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962-65 (9th Cir. 2006) (en banc); *Treves v. Union Sec. Ins. Co.*, No. C12-1337RAJ, 2014 WL 325149, at *2-3 (W.D. Wash. Jan. 29, 2014).

adequate de novo review of the benefit decision"). Mr. Pearson has the burden of proving his entitlement to LTD benefits. *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

### B. Mr. Pearson's Entitlement to Benefits

The court's review of the administrative record demonstrates that Mr. Pearson was able to perform the material duties of his job. Mr. Pearson is therefore not disabled under the terms of the policy and is not entitled to LTD benefits.

Sitting and, to a lesser degree, standing and walking were "material duties" of Mr. Pearson's job. (A.R. at 1049.) To some extent, it was possible to "reasonably . . . modify" those requirements (*id.* at 50) and nonetheless perform the job "as it is normally performed in the national economy" (*id.* at 62). Indeed, Group Health provided Mr. Pearson with several such accommodations, which included a couch, a zero-gravity chair, and flexible work hours. (*Id.* at 542.) This arrangement allowed Mr. Pearson to "lie down for extended periods, which helped reduce back pain," and to "come in to work only three days a week to limit further the time [he was] sitting/standing." (*Id.*) Nonetheless, Mr. Pearson's job required significant sitting, standing, and walking.[10] (*Id.*)

---

[10] Certain cognitive requirements also constituted "material duties" of Mr. Pearson's job. (A.R. at 1049.) Mr. Pearson intermittently raises the impact that his pain had on his cognitive abilities, and the court acknowledges the mental impact that pain can have. (*See, e.g.*, Plf. Brief at 7 (raising Dr. Andersen's opinion that Mr. Pearson "had pain levels that made it hard for him to think and sleep and had pain spikes that significantly limited his activity").) However, the thrust of Mr. Pearson's argument and evidence relates to his inability to perform the physical material duties of his job, such as sitting. (*See generally id.*; A.R.) To the extent Mr. Pearson intends to argue that his disability stemmed from an inability to perform the cognitive material duties of his former occupation, the court rejects that contention as unsupported by the evidence.

ORDER- 11

The court bases its conclusion largely on the differences in methodology used and information considered by the two groups of doctors. In April 2012, Dr. Andersen provided one of the most concise and recent articulations of his opinion on Mr. Pearson's condition:

> There is no clear cure for this problem . . . and given symptomatic progression [I] would anticipate that this will continue for the remainder of [Mr. Pearson's] life. . . . [T]here does not appear to be a treatment option available to him that would improve his pain control and restore his ability to maintain an effective work presence at the job he took leave from. His functional impairments continue to be limited sitting and standing tolerance for roughly an hour at a time but this deteriorates the more he does. He is thus unable to sustain sitting and standing effectively for a work day by his history. If he does this his pain escalates. He lies down to get relief and control. It is for these reasons that I have said that I don't think he can sustain a reasonable work presence for even sedentary activities.

(*Id.* at 1001.) In September 2014, Dr. Andersen amended this opinion to state that Mr. Pearson "has difficulty sitting more than 20 minutes at a time due to pain." (*Id.* at 220.) However, at that juncture Mr. Pearson's most recent office visit to Dr. Andersen had apparently been in May 2012. (*Id.* at 802-05.) Dr. Gayman likewise did "not agree that [Mr. Pearson wa]s capable of 8 hours of sedentary work daily." (*Id.* at 275.)

Although Drs. Gayman and Andersen reviewed at least some of the reports that Aetna solicited, their opinions are substantially based on Mr. Pearson's self-reports of his pain level and ability to continue work. Mr. Pearson's self-reports are relevant information and to some extent, unavoidable sources of evidence where pain is at issue. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("[I]ndividual reactions to pain are subjective and not easily determined by reference to objective measurements."). Moreover, some deference is due to Drs.

ORDER- 12

Gayman and Andersen in light of the significant time they spent treating Mr. Pearson over the years. (A.R. at 1000.) However, their conclusions do not appear to incorporate valuable, objective information that Drs. Swotinsky, Allison, and Duvall considered.

Drs. Swotinsky, Allison, and Duvall took a more holistic approach to reviewing Mr. Pearson's records and condition. Those doctors had the benefit of input from Drs. Andersen and Gayman as well as objective outside information and, in the case of Dr. Allison, a direct examination of Mr. Pearson. (*Id.* at 283.) All three doctors found the evidence of Mr. Pearson's physical recreational activities to undermine his self-reports of his condition. (*See id.* at 351 (Dr. Swotinsky), 298-301 (Dr. Allison), 219 (Dr. Duvall).) For instance, in April 2011, Mr. Pearson injured his knee "biking through the sand dunes in Miami" when he "tried to power his way out" of "deep sand." (*Id.* at 901.) That knee injury flared up when Mr. Pearson was "out gardening for more than 3 hours or so," further indicating Mr. Pearson's physical activity level in the summer of 2011. (*Id.*) Furthermore, Mr. Pearson took a weeklong salmon fishing trip in July 2011 and "sat in a boat for 8 hours" over a separate weekend in August 2011. (*Id.* at 891, 916.) Furthermore, at least in 2010, Mr. Pearson maintained an exercise routine that included push-ups, an exercise bike, and a stairmaster workout that Mr. Pearson characterized as "strenuous." (*Id.* at 381, 441, 446, 480.)

Mr. Pearson almost entirely declines to address this evidence in his response, contending only that focusing on Mr. Pearson's activity level "is an end-run around the relevant question" and that "[o]ccasionally taking a fishing trip, lifting weights and exercising to maintain some level of mobility are all worthwhile endeavors that would be

recommended by any health care provider." (Plf. Resp. at 9.) Although the latter contention may be accurate, that does not make the information irrelevant to the court's determination. Performing these discretionary activities is inconsistent with the degree of pain and limitation that Mr. Pearson professes and is therefore convincing evidence that Mr. Pearson's pain levels are not as severe as he reports. Furthermore, although some of Mr. Pearson's doctors were aware of some of these activities, neither Dr. Andersen nor Dr. Gayman addresses Mr. Pearson's activity level head-on. (*See, e.g.*, A.R. at 268, 383-84, 1000-05.) Their silence on this issue calls into question the completeness of the information upon which Dr. Andersen and Gayman formed their opinions.

Mr. Pearson also places significant weight on the ALJ's SSA determination that he is disabled. (*See id.* at 990-99; Plf. Brief at 20 ("In this case, Aetna simply ignored the Social Security determination of benefits."); Plf. Resp. at 11 ("Aetna gave no weight to the Social Security disability decision, and Aetna in essence admits such in their brief . . . .").) Mr. Pearson contends that the SSA determination was based on a more stringent standard than the LTD policy imposes—whether Mr. Pearson had the "residual functional capacity" to perform his "past relevant work"—and that the ALJ's conclusion should therefore be persuasive to this court. (Plf. Brief at 20-21, 23 (citing *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 633-35 (9th Cir. 2009)); Plf. Resp. at 5-6, 11-12.)[11]

---

[11] The parties also dispute whether Aetna adequately considered the ALJ's SSA decision. Both parties discuss the *Montour* court's admonition that "[w]hile [sic] ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary

Whether or not Mr. Pearson's comparison of the applicable standards is fully accurate, the court finds the SSA decision only somewhat relevant. This court bases its analysis on a different record than the ALJ reviewed. More specifically, the ALJ's opinion makes no reference to the extensive discretionary physical activities that Mr. Pearson performed in 2010 and 2011. (*See* A.R. at 993-98.) The ALJ also lacked the benefit of opinions from Drs. Swotinsky, Allison, and Duvall. (*See id.*) The only medical opinion before the ALJ that was adverse to Mr. Pearson came from Dr. Lisa Garrison. (*Id.* at 997.) Dr. Garrison's opinion was "based on one examination of the claimant and did not consider any medical records" and the ALJ accordingly gave it "little weight." (*Id.*)

Here, in contrast, three doctors have extensively reviewed and analyzed Mr. Pearson's records, and one performed an examination of Mr. Pearson. Those doctors' conclusions indicate that Mr. Pearson is capable of performing the material duties of his prior job. Moreover, those three doctors formed their opinions with knowledge of Mr. Pearson's fishing trips, travel, gardening, and exercise routine, none of which are referenced by the ALJ. *See Montour*, 588 F.3d at 636 ("Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and

---

conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" 588 F.3d at 635 (quoting *Glenn v. Metlife*, 461 F.3d 660, 674 (6th Cir. 2006)). However, *Montour* addressed an administrator's determination based on a policy with an enforceable discretionary clause, which unlike here entitled the administrator's decision to some deference. *Compare id.* at 626 (Where, as here, the plan does grant such discretionary authority, we review the administrator's decision for abuse of discretion." (internal quotations omitted)) *with supra* n.9. In light of the *de novo* standard of review applicable here, *see supra* § III.A, the court finds it irrelevant whether and to what extent Aetna considered the SSA's decision in making its ultimate determination.

ORDER- 15

1 contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied."). In light of the different evidence considered by the ALJ, the court is not persuaded by the SSA determination.

In summary, Drs. Swotinsky, Allison, and Duvall evaluated Mr. Pearson's health with more complete information than his previous doctors had. Furthermore, Mr. Pearson's activity level undermines his reports of debilitating pain. The court accordingly concludes that Mr. Pearson has not demonstrated that he was incapable of performing the material duties of his job, and that he is therefore not disabled under the terms of the LTD policy.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Aetna's motion for judgment on the record (Dkt. # 10) and DENIES Mr. Pearson's motion for judgment on the record (Dkt. # 9).

Dated this 10th day of May, 2016.

JAMES L. ROBART
United States District Judge